Slip Op. 11-104

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                            :
NUCOR FASTENER DIVISION,                    :
                                            :
            Plaintiff,                      :
                                            :
      v.                                    :        Before:       WALLACH, Judge
                                            :        Court No.:    09-00531
UNITED STATES,                              :
                                            :        **PUBLIC VERSION**
            Defendant,                       :
                                            :
      and                                   :
                                            :
XL SCREW CORPORATION, et al.,               :
                                            :
            Defendant-Intervenors.          :
_____     :

[ Plaintiff's motion is granted, and this matter is remanded to ITC. ]


                              Dated:         August 11, 2011


Wiley Rein LLP (Alan H. Price, Daniel B. Pickard, and Maureen E. Thorson) for Plaintiff Nucor
Fastener Division.

James M. Lyons, General Counsel, Neal J. Reynolds, Assistant General Counsel for Litigation,
U.S. International Trade Commission (Mary Jane Alves) for Defendant United States.

Barnes, Richardson & Colburn (Matthew T. McGrath and Stephen W. Brophy) for Defendant-
Intervenors Porteous Fastener Co., Heads & Threads International LLC, Soule, Blake &
Wechsler, Inc., Indent Metals, LLC, XL Screw Corporation, Bossard North America, the Hillman
Group, Fastenal Co., and Fasteners and Automotive Products and Squire, Sanders & Dempsey,
LLP (Peter J. Koenig) for Defendant-Intervenors Brighton-Best International, Inc. and Brighton-
Best International (Taiwan) Inc.[1]

_____

[1] Defendant-Intervenors Porteous Fastener Co., Heads & Threads International LLC, Soule, Blake &
Wechsler, Inc., Indent Metals, LLC, XL Screw Corporation, Bossard North America, the Hillman Group, Fastenal
Co., and Fasteners and Automotive Products responded to Plaintiff's Motion; Defendant-Intervenors Brighton-Best
International, Inc. and Brighton-Best International (Taiwan) Inc. did not. See Docket for Court No. 09-00531;
Defendant-Intervenors' Response at 1.

## OPINION

**Wallach, Judge:**

# I
# INTRODUCTION

Plaintiff Nucor Fastener Division challenges the negative preliminary injury determinations issued by the U.S. International Trade Commission ("ITC") in antidumping and countervailing duty investigations of certain standard steel fasteners ("CSSF") from the People's Republic of China ("China") and Taiwan.[2] See Plaintiff's Motion for Judgment on the Agency Record, Doc. Nos. 32, 36 ("Plaintiff's Motion"); Brief in Support of Nucor Fastener Division's Rule 56.2 Motion, Doc. Nos. 32, 36 ("Plaintiff's Memo"); Certain Standard Steel Fasteners From China and Taiwan; Determinations, 74 Fed. Reg. 58,978 (November 16, 2009); U.S. International Trade Commission, Certain Standard Steel Fasteners from China and Taiwan, Investigation Nos. 701-TA-472 and 731-TA-1171-1172 (Preliminary), USITC Pub. 4109 (November 2009) ("ITC's Report"); Views of the Commission (November 19, 2009), Confidential List ("CL") 228 ("Views"); Certain Standard Steel Fasteners from China and Taiwan, Staff Report to the Commission on Investigation Nos. 701-TA-472 and 731-TA-1171-1172 (Preliminary) (November 2, 2009), CL 224 ("Staff Report").[3]  The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  Because ITC's reliance on certain data collected in these investigations is arbitrary, capricious, and an abuse of discretion, Plaintiff's Motion is GRANTED, and this matter is REMANDED to ITC for action consistent with this opinion.

---

[2] Use of the plural terms "determinations" and "investigations" is deliberate. See Shandong TTCA Biochemistry Co. v. United States, 710 F. Supp. 2d 1368, 1372-74 (CIT 2010).

[3] ITC's Report comprises the public version of the Views, the public version of the Staff Report, and certain other supporting documents. See Report.  Pagination is different between the public and confidential versions of the Views and between the public and confidential versions of the Staff Report. Compare Report with Views and Staff Report.

## II
## BACKGROUND

In 2009, in response to a petition filed by Plaintiff, the U.S. Department of Commerce ("Commerce") initiated and ITC instituted an antidumping duty investigation of CSSF from Taiwan and both antidumping and countervailing duty investigations of CSSF from China. <u>See</u> <u>Certain Standard Steel Fasteners From the People's Republic of China and Taiwan: Initiation of</u> <u>Antidumping Duty Investigations</u> ("AD Notice"), 74 Fed. Reg. 54,537 (October 22, 2009); <u>Certain Standard Steel Fasteners From the People's Republic of China: Initiation of</u> <u>Countervailing Duty Investigation</u>, 74 Fed. Reg. 54,543 (October 22, 2009); <u>Certain Standard</u> <u>Steel Fasteners From China and Taiwan</u> ("CVD Notice"), 74 Fed. Reg. 49,889 (September 29, 2009).  Commerce's initiation notices define CSSF as "certain standard nuts, standard bolts, and standard cap screws, of steel other than stainless steel" and expressly exclude, <u>inter alia</u>, "bolts, cap screws, and nuts produced for an original equipment manufacturer (OEM) part number specific to any" automobile, work truck, medium-duty passenger vehicle, or aircraft, each as elsewhere defined. AD Notice, 74 Fed. Reg. at 54,542-43; CVD Notice, 74 Fed. Reg. at 54,546-47.

By the time Commerce issued these notices, however, ITC had already prepared and transmitted its foreign producer,[4] domestic producer, and domestic importer questionnaires. <u>See</u> Memorandum from Catherine DeFilippo, Office of Investigations, ITC, to The Commission, Re: Investigation Nos. 701-TA-472 and 731-TA-1171-1172 (Preliminary): Certain Standard Steel Fasteners from China and Taiwan—Supplemental Memorandum to the Staff Report (November 5, 2009), CL 227 ("Supplemental Memo").  The instructions accompanying these questionnaires provide a definition of CSSF that comes from the petition's scope language and that therefore

---

[4] In this opinion, a non-producing exporter is also a "producer" in the context of China or Taiwan.

makes no explicit reference to any automotive, aerospace, or OEM exclusion. <u>See</u> Instruction

Booklet: General Information, Instructions, and Definitions for Commission Questionnaires,

Certain Standard Steel Fasteners from China and Taiwan, Investigation Nos. 701-TA-472 and

731-TA-1172-1172 (Preliminary) ("Questionnaire Instructions"), Public List ("PL") 8 at 5;

Certain Standard Steel Fasteners from the People's Republic of China and Taiwan: Petition for

the Imposition of Antidumping and Countervailing Duties Pursuant to Section 731 of the Tariff

Act of 1930, As Amended, Volume I: Volume on Injury, CL 1 ("Petition") at 3.[5]  The instructions

define "standard fasteners" as those "that can be described from nationally recognized consensus

standards documents and may be produced by any interested manufacturing facility."

Questionnaire Instructions, PL 8 at 5.  They also distinguish standard fasteners from "modified

standard" fasteners as well as from "specialty/patented fasteners," a category that comprises

"proprietary-patented" fasteners and "engineered special parts." <u>Id.</u>

ITC sent questionnaires to "all" firms it believed produced CSSF in the United States,

Staff Report at III-1-2, IV-1, certain firms it believed imported CSSF into the United States, <u>id.</u> at

IV-1, and certain firms it "believed to be possible producers or exporters of CSSF" in China or

Taiwan, <u>id.</u> at VII-1, VII-3.  ITC received responses from 72 percent of those domestic producers

(26 of 36 firms), <u>id.</u> at III-1, 46 percent of those particular domestic importers (36 of 78 firms),

<u>id.</u> at IV-1, 35 percent of those particular foreign producers in China (12 of 34 firms), <u>id.</u> at VII-

---

[5] Plaintiff's petition defines the "scope of the requested investigations" as "certain standard nuts, bolts, and cap screws of steel other than stainless steel." Petition, CL 1 at 3.  That definition further identifies the physical characteristics of these fasteners, notes that they are "typically certified to the specifications published by" certain organizations, and references six relevant customs subheadings "for convenience and customs purposes." <u>Id.</u> at 3-4. Although that definition provides no additional explanation of the term "standard," Plaintiff states later in its petition that the proposed scope "excludes proprietary or modified fasteners used by aerospace and automotive [OEMs] (<u>e.g.</u>, Boeing, Ford, General Motors, Chrysler). These products are produced to either proprietary standards (<u>i.e.</u>, patented fasteners), or are produced to OEM customer proprietary prints that are modified beyond the standard specification for OEM specific applications (otherwise known as 'specials') and consumed by that OEM." <u>Id.</u> at 6-7.

1, and an unspecified percent of those particular foreign producers in Taiwan, id. at VII-3.[6] Some of these responses were deemed unusable as they were incomplete or untimely. Id. at III-1 nn.1, 5, IV-1 n.2.  In addition, some responding firms certified that they did not produce, export, or import CSSF during the period of investigation ("POI"), and others provided data relating only to fasteners that were ultimately excluded from the scope of the investigation. Id. at III-1, IV-1, VII-1, VII-3.

In its questionnaires, ITC asked domestic producers as well as importers to report their transactions of CSSF and certain other fasteners during the period of investigation ("POI") running from January 2006 through June 2009. See Staff Report at III-1, IV-1, C-4.  Based on the responses of domestic producers, ITC concluded that Plaintiff is by far the largest domestic producer of CSSF, accounting for [[ a certain ]] percent of reported production in 2008. Id. at III-2.  The two largest reporting domestic producers together account for [[ a larger ]] percent of reported production in that year. Id.  The reported production of a third firm, [[Producer A ]] ("Producer A"), accounts for another [[ smaller ]] percent. Id.  However, Plaintiff argued before ITC that this firm manufactured only nonstandard [[ versions of a certain type of fastener ]] and hence produced no CSSF during the POI. See Post-Conference Brief of Nucor Fastener (October 20, 2009), CL 234 at 1 n.3.

ITC's domestic producer and importer questionnaires also solicited pricing data for the four specific "CSSF product categories" that Plaintiff had proposed in its petition. Staff Report at

---

[6] ITC sent questionnaires to 23 firms in Taiwan but received responses from at least 49 firms. Staff Report at VII-3.  According to ITC, "[m]ore questionnaires were received than sent because staff believes that the Taiwan industry association circulated the Commission's questionnaire among its members to increase participation in these investigations." Id. at VII-3 n.1.  The Staff Report does not state whether ITC received responses from all of the firms in Taiwan to which it sent questionnaires. Id. at VII-3.

V-8.[7]  Some of the responding firms "reported useable price information, but not necessarily for all [pricing] products or periods." Id. at V-8-9.[8]  That information covered between 1.1 and 3.6 percent of total reported CSSF shipments during the POI. Id. at V-9.  ITC attributed these "limited coverage ratios" to "the large number of CSSF products." Id. at V-9 n.29.

In addition to these data, the domestic producer questionnaire requested "profit-and-loss statements for CSSF only." Id. at VI-3 n.1.  However, some of the responding producers, including Producer A, "instead estimated all of their CSSF costs based upon the ratio of CSSF sales to all fastener sales.  As a result, the [reported] profit margin for CSSF and all other fasteners was the same." Id.  These firms together account for [[ a minority ]] percent of reported production in 2008. Id. at III-2.

The domestic producer questionnaire also asked whether the recipient had experienced any negative financial effects, lost revenues, or lost sales as a result of CSSF imports from China and Taiwan and whether it anticipated any negative financial impacts from these imports. See, e.g., U.S. Producers' Questionnaire Response of Nucor Fastener, CL 101 ("Nucor's Questionnaire Response") at III-14-15, VII-2-3.  Six domestic producers accounting for [[ a very significant ]] percent of reported 2008 production identified negative financial effects. See Plaintiff's Memo at 33-34, 37; Staff Report at III-2.  Five of these firms alleged that they had lost revenues or sales, and the sixth "stated that the prices of CSSF from China and Taiwan are so low that the firm does not bother to provide competing price quotes when product from these countries is being considered by a potential customer." Staff Report at V-24; see id. at III-2.

---

[7] For example, one of these four products is "Hex cap screw, Grade 8, type 1 steel, 5/8 inch diameter by 2 inches long, 18 threads per inch, fully threaded, and zinc phosphate and oil coating." Staff Report at V-8.

[8] Specifically, "[t]hree U.S. producers of CSSF, six U.S. importers of the specified CSSF products from China, and nine U.S. importers of CSSF from Taiwan reported useable price information, but not necessarily for all products or periods." Staff Report at V-8-9.

In a unanimous vote, ITC determined that "there is no reasonable indication that an industry in the United States is materially injured or threatened with material injury by reason of imports of [CSSF] from China and Taiwan." Views at 3.  To reach these determinations, ITC also found "no likelihood that any evidence we would have obtained in any final phase of these investigations would" provide any such indication. Id. at 9.  ITC's Views make extensive reference to its Staff Report. See generally Views.[9]

Plaintiff now challenges ITC's determinations. See Complaint, Doc. No. 6 (December 15, 2009).  It alleges that ITC relies on manifestly insufficient and irrelevant data and fails to account for information suggesting material injury. Plaintiff's Memo at 2.  Such errors, it argues, render ITC's determinations "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Plaintiff's Motion at 2; see Plaintiff's Memo.

## III
## STANDARD OF REVIEW

In reviewing negative preliminary injury determinations, "the court shall hold unlawful any determination, finding, or conclusion found . . . to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1).[10]

"Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one.  The court is not empowered to substitute its judgment for that of the agency." Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971), cited in Tex. Crushed Stone Co. v. United States, 35 F.3d 1535, 1540 (Fed. Cir. 1994).  Accordingly, the court reviews ITC's application of—but does not itself apply—the

---

[9] The ITC staff assigned to the instant investigations consisted of a supervisory investigator, an investigator, an industry analyst, an economist, an accountant, a statistician, an investigatory intern, and two attorneys. See Staff Report (cover page).

[10] For a comparison of the "arbitrary and capricious" standard with the "substantial evidence" standard, see Consol. Fibers, Inc. v. United States, 535 F. Supp. 2d 1345, 1352-54 (2008).

statutory "reasonable indication" standard. See Comm. for Fair Coke Trade v. United States, 27 CIT 774, 777 (2003); see also infra Part IV.A.  The court "ascertain[s] whether there was a rational basis for the determination" and "may only reverse [that] determination if there is a 'clear error' of judgment and where there is 'no rational nexus between the facts found and the choices made.'" Ranchers-Cattlemen Action Legal Found. v. United States, 23 CIT 861, 878, 74 F. Supp. 2d 1353 (1999) (citing Torrington Co. v. United States, 16 CIT 220, 223, 790 F. Supp. 1161 (1992) and quoting Conn. Steel Corp. v. United States, 18 CIT 313, 315, 852 F. Supp. 1061 (1994)).  "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983) (discussing agency rulemaking).

The tension inherent in this standard of review is captured in part by the Supreme Court's statement that "[w]hile we may not supply a reasoned basis for the agency's action that the agency itself has not given, we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285-86, 95 S. Ct. 438, 42 L. Ed. 2d 447 (1974) (internal citations omitted).

On one hand, "[t]he court can only review the reasoning that the Commission expresses." Fair Coke, 27 CIT at 776 (quoting Altx, Inc. v. United States, 26 CIT 1425, 1426 (2002) (applying the substantial evidence standard)).  ITC must provide notice of its determination and of "the facts and conclusions on which its determination is based." 19 U.S.C. § 1673b(f).  All of "ITC's conclusions must be based on evidence, not conjecture, and in no event may the court

'supply a reasoned basis for the agency's action that the agency itself has not given. . . .'" <u>Fair Coke</u>, 27 CIT at 776 (quoting <u>Bowman</u>, 419 U.S. at 285-86).  Likewise, the court "may not accept . . . counsel's <u>post hoc</u> rationalizations for agency action," because such "action must be upheld, if at all, on the basis articulated by the agency itself." <u>Motor Vehicle Mfrs. Ass'n</u>, 463 U.S. at 50.  "For purposes of affirming no less than reversing its orders, an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency." <u>SEC v. Chenery Corp.</u>, 318 U.S. 80, 88, 63 S. Ct. 454, 87 L. Ed. 626 (1943).

On the other hand, "Congress did not mandate" that ITC "discuss every facet of its investigation, but only 'material issues of law or fact.'" <u>Jeannette Sheet Glass Corp. v. United States</u>, 9 CIT 154, 161, 607 F. Supp. 123 (1985) (subsequent history omitted) (quoting House Doc. No. 96-153, 96th Cong., 1st Sess. 27 (1979), reprinted in 1979 U.S.C.C.A.N. 655, 685). This excludes arguments and facts that are "irrelevant or trivial." Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316 (1994) ("SAA") at 892, reprinted in 1994 U.S.C.C.A.N. 4040, 4215.[11]  "Absent some showing to the contrary, the Commission is presumed to have considered all evidence in the record," <u>Conn. Steel Corp.</u>, 18 CIT at 316 (quoting <u>Rhone Poulenc, S.A. v. United States</u>, 8 CIT 47, 55, 592 F. Supp. 1318 (1984) (applying the substantial evidence standard)), and "a party attempting to overcome [that] presumption must do more than assert a mere failure to discuss evidence," <u>Dastech Int'l v. USITC</u>, 21 CIT 469, 477, 963 F. Supp. 1220 (1997) (applying the substantial

---

[11] The Uruguay Round Agreements Act ("URAA") approved the new World Trade Organization Agreement, and the agreements annexed thereto, "resulting from the Uruguay Round of multilateral trade negotiations [conducted] under the auspices of the General Agreement on Tariffs and Trade." 19 U.S.C. § 3511(a)(1).  The SAA, which was submitted to and approved by Congress, <u>see</u> 19 U.S.C. § 3511(a)(2), is "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and [the Uruguay Round Agreements] Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

evidence standard).  More generally, an ITC determination is "presumed to be correct," and "[t]he burden of proving otherwise shall rest upon the party challenging" it. 28 U.S.C. § 2639.

In resolving this tension, the court is guided by two principles.  First, "every party before an agency of the United States has a right to expect a fair and logical determination containing as much analysis as is necessary to adequately demonstrate the basis for its conclusions." Usinor v. United States, 26 CIT 767, 785 (2002) (applying the substantial evidence standard).  Second, "[t]he court is not empowered to substitute its judgment for that of the agency." Citizens to Pres. Overton Park, 401 U.S. at 416.  Accordingly, while the court will necessarily exercise some judgment at the extremes in order to determine whether evidence is trivial or fatal in relation to ITC's determinations, it will not otherwise reweigh evidence addressed in those determinations or weigh evidence that should instead be addressed in a remand redetermination.

# IV
## DISCUSSION

Application of the law, see infra Part IV.A, to the facts of this matter, see supra Part II, compels five main holdings.  First, ITC improperly treats its import data as "comprehensive." See infra Part IV.B.  Second, ITC identifies, and the court discerns, no rational basis for unqualified reliance on Producer A's questionnaire response. See infra Part IV.C.  Third, ITC permissibly relies on limited pricing data. See infra Part IV.D.  Fourth, ITC sufficiently addresses concerns about certain estimated data. See infra Part IV.E.  Fifth, ITC sufficiently addresses allegations of injury made by domestic producers. See infra Part IV.F.

**A**

**Statutory Overview**

In making a preliminary injury determination in an antidumping or countervailing duty

investigation, ITC is statutorily required to:

> determine, based on the information available to it at the time of the
> determination, whether there is a reasonable indication that—
> (A) an industry in the United States—
>> (i) is materially injured, or
>> (ii) is threatened with material injury, or
> (B) the establishment of an industry in the United States is materially retarded,
> by reason of imports of the subject merchandise and that imports of the subject
> merchandise are not negligible.

19 U.S.C. § 1673b(a).  As part of such a determination, ITC:

> (i) shall consider—
>> (I) the volume of imports of the subject merchandise,
>> (II) the effect of imports of that merchandise on prices in the United States
>> for domestic like products, and
>> (III) the impact of imports of such merchandise on domestic producers of
>> domestic like products, but only in the context of production operations
>> within the United States; and
> (ii) may consider such other economic factors as are relevant to the determination
> regarding whether there is material injury by reason of imports.

19 U.S.C. § 1677(7)(B).  In evaluating import volume, "the Commission shall consider whether"

that volume, "or any increase in that volume, either in absolute terms or relative to production or

consumption in the United States, is significant." 19 U.S.C. § 1677(7)(C)(i).  In evaluating price

effects:

> the Commission shall consider whether—(I) there has been significant price
> underselling by the imported merchandise as compared with the price of domestic
> like products of the United States, and (II) the effect of imports of such
> merchandise otherwise depresses prices to a significant degree or prevents price
> increases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii).  Finally, in evaluating impact:

> the Commission shall evaluate all relevant economic factors which have a bearing
> on the state of the industry in the United States, including, but not limited to—

(I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,
(II) factors affecting domestic prices,
(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,
(IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and
(V) in a[n antidumping] proceeding . . . , the magnitude of the margin of dumping.

The Commission shall evaluate all [such] relevant economic factors . . . within the context of the business cycle and conditions of competition that are distinctive to the affected industry.

19 U.S.C. § 1677(7)(C)(iii).

"ITC has consistently viewed [19 U.S.C. § 1673b(a)'s] 'reasonable indication' standard as one requiring that it issue a negative [preliminary] determination . . . only when (1) the record as a whole contains clear and convincing evidence that there is no material injury or threat of such injury; and (2) no likelihood exists that contrary evidence will arise in a final investigation." Am. Lamb Co. v. United States, 785 F.2d 994, 1001 (Fed. Cir. 1986).  In applying this standard, ITC "may weigh all evidence before it and resolve conflicts in the evidence." Ranchers-Cattlemen, 23 CIT at 878 (citing Am. Lamb, 785 F. 2d at 1002-04).

## B
### ITC Improperly Treats Its Import Data As "Comprehensive"

ITC asserts that it "was able to collect comprehensive data on CSSF in these investigations," Views at 4, including "comprehensive import data," id. at 6.[12]  ITC relies on these data—and on its characterization of them as comprehensive—in finding both "no

---

[12] In City of Milwaukee v. Illinois, 451 U.S. 304, 101 S. Ct. 1784, 68 L. Ed. 2d 114 (1981), the Supreme Court used the terms "all-encompassing" and "comprehensive" interchangeably in the context of statutory displacement of federal common law and held that establishment by Congress of "a self-consciously comprehensive program . . . strongly suggests that there is no room" for court-made improvements. City of Milwaukee, 451 U.S. at 318 (emphasis added); see also Webster's Third New International Dictionary (2002) (defining "comprehensive" as "covering a matter under consideration completely or nearly completely" or "accounting for or comprehending all or virtually all pertinent considerations").

reasonable indication" of material injury or threat of material injury and "no likelihood that any evidence we would have obtained in any final phase of these investigations would" provide any such indication. Id. at 3, 9; see id. at 3-50; see also 19 U.S.C. § 1673b(a).[13]

Plaintiff challenges ITC's characterization of its data as "comprehensive," most persuasively with regard to the import volumes documented and evaluated by ITC. See Plaintiff's Memo at 25-30.[14]  ITC obtained these volumes from the questionnaire responses of 30 importers, which represent only a portion of the 36 importers that provided some response, which in turn represent only a portion of the 78 importers to which ITC sent a questionnaire, which in turn represent only a portion of the "several hundred importers of subject merchandise" alleged by Plaintiff in its petition. Plaintiff's Memo at 26; see Staff Report at IV-1.  In arguing that "the basis for the agency's [conclusion] that the import coverage was sufficient to enable a reliable volume analysis [is] completely unclear," Plaintiff identifies "three potential explanations" for ITC's conclusion and explains why "all are illogical." Plaintiff's Memo at 26. Defendant defends these three bases and identifies no others. See Memorandum of Defendant United States International Trade Commission in Opposition to Plaintiff's Motion for Judgment on the Agency Record ("Defendant's Response") at 27-33.[15]  The court discusses each in turn.

---

[13] Indeed, the collection of "comprehensive" data would render unlikely the collection of additional significant data, contrary or not.

[14] This opinion uses the statutory term "volume," 19 U.S.C. § 1677(7), to refer to the amount of imports, which the instant investigations describe primarily in terms of weight, see, e.g., Views at 36-38.

[15] Defendant states that Plaintiff "contests the Commission's volume analysis primarily on the ground that it disagrees with the Commission's use of importer questionnaires to measure subject imports." Defendant's Response at 28-29 (citing Plaintiff's Memo at 2, 5-6, 10-12, 25-30, 38-39).  Defendant then explains why ITC chose to use questionnaire data rather than customs data. See id. at 29-30.  To the extent that Defendant's statement refers to the ITC's choice of questionnaire data over customs data, see id. at 29-30, Plaintiff correctly describes that statement as "a clear mischaracterization" of its argument, Nucor Fastener Division's Reply Brief, Doc. Nos. 60, 61 ("Plaintiff's Reply") at 12; see Plaintiff's Memo at 2, 5-6, 10-12, 25-30, 38-39.  However, the court construes Defendant's statement to refer to the way in which ITC used the questionnaire data rather than to ITC's choice of those data.

First, Plaintiff questions both the meaning and the utility of ITC's statement that the "responses ultimately received from [the 30 importers] represented the large majority of known CSSF imports from China and Taiwan between January 2006 and June 2009," Views at 6; Staff Report at IV-1. See Plaintiff's Memo at 26.  Plaintiff infers, and the court agrees, that "known CSSF imports" refers to volumes reported by the 36 importers that provided at least a partial response. See Plaintiff's Memo at 26-27.  The sole support of ITC's statement in the Views is a citation to the Staff Report, see Views at 6 n.19; the sole support of the same statement in the Staff Report is a footnote discussing why responses received from six of the 36 importers were not used and noting that only one of those six reported "CSSF imports in somewhat substantial quantities" from a subject country, Staff Report at IV-1 n.2.

Defendant offers a different construction of ITC's statement, contending that ITC compared the importers responsible for the 30 responses "to its initial list of 78 firms that appeared to be the major importers of all types of steel fasteners covered by these [customs] subheadings." Defendant's Response at 30-31.  In this way, "the Commission and its staff were able to determine that they had received data from the large majority of significant known imports of fasteners from China and Taiwan during the POI, indicating that they had good coverage for importers who were the likely importers of subject CSSF." Id. at 31.  Defendant's construction, however, is problematic.  Critically, the contention that supports it is entirely post hoc; Defendant cites no record evidence of any such comparison. See Defendant's Response; Motor Vehicle Mfrs. Ass'n, 463 U.S. at 50.  Moreover, the construction is undermined by ITC's assertion that five of the six relevant customs subheadings "contain[] large amounts of fasteners

not subject to these investigations." Views at 5.[16]  Finally, if Defendant means "significant known <u>importers</u>" rather than "significant known imports," its construction might support a conclusion that reported CSSF imports account for the majority of actual (<u>i.e.</u>, known plus unknown) CSSF imports.  This, however, is not ITC's stated conclusion; ITC instead refers only to "known CSSF <u>imports</u>." Views at 6; Staff Report at IV-1 (emphasis added).

Second, Plaintiff questions how the 30 "questionnaire responses show [that] a small number of firms accounted for a large portion of CSSF imports," Views at 6. <u>See</u> Plaintiff's Memo at 27.  At most, Plaintiff argues, these data show that "a small number of firms accounted for a large portion of" <u>reported</u> CSSF imports. Plaintiff's Memo at 27.  Defendant responds that ITC's observation is consistent with testimony at a staff conference that "this industry involved a limited number of large importers." Defendant's Response at 31 (citing Preliminary Conference in the Matter of Certain Standard Steel Fasteners from China and Taiwan (October 14, 2009), PL 46 ("Conference Transcript") at 71, 107-08, 118, 207).  However, the five transcript pages cited by Defendant contain no such characterization of the import industry. <u>See</u> Conference Transcript, PL 46 at 71, 107-08, 118, 207.[17]  Moreover, Defendant points to no record evidence demonstrating or even discussing an overlap between the large importers that responded to the questionnaire and the large importers that were allegedly referenced at that conference. <u>See</u> Defendant's Response at 30-33.  Finally, neither ITC nor Defendant explains why the alleged

---

[16] Although CSSF imports could conceivably constitute a "large majority" of the imports under subheadings that nonetheless "contain[] large amounts of [non-CSSF] fasteners," ITC provides no such explanation. <u>See</u> Views; Staff Report.

[17] In response to a question by the court, Defendant stated that these five pages had been cited in error. <u>See</u> June 23, 2011 Oral Argument at 12:41:04-12:47:45.  Pursuant to the court's instruction, Defendant subsequently filed a letter citing ten different pages. <u>See</u> Letter from Mary Jane Alves, Attorney-Advisor, U.S. International Trade Commission, to Evan J. Wallach, Judge, U.S. Court of International Trade, RE: <u>Nucor Fastener Division v. United States</u>, Court No. 09-00531 (June 24, 2011), Doc. No. 79, app. 2 (citing Conference Transcript, PL 46 at 65-66, 103-04, 113-14, 175-77, 199).  These ten pages also contain no such characterization of the import industry. <u>See</u> Conference Transcript, PL 46 at 65-66, 103-04, 113-14, 175-77, 199.

presence of "a limited number of large importers" means that the aggregate imports of the numerous nonresponding importers are necessarily small. See Views; Staff Report; Defendant's Response at 30-33.[18]  ITC appears to conclude that it can treat its sample of responding importers as the universe of relevant importers based on an analysis in which it treats that sample as that universe.  Plaintiff correctly characterizes this logic as "entirely circular." Plaintiff's Memo at 27.

Third, Plaintiff questions the conclusion that ITC draws from comparing importer responses with foreign producer responses. See id. at 27-30.  In their respective responses, firms in Taiwan reported exporting more subject merchandise to the United States than firms in the United States reported importing from Taiwan. Compare Staff Report at IV-3 with id. at VII-4. Indeed, for each of 2006, 2007, 2008, interim 2008, and interim 2009, the reported export volume exceeds the reported import volume by [[ a significant ]] percent. Plaintiff's Memo at 29 (citing Staff Report at IV-3, VII-4).  Plaintiff concludes that these higher export volumes demonstrate that the import volumes used by ITC are "significantly underreported." Id. at 29.[19]

---

[18] In support of its conclusion that "a small number of firms accounted for a large portion of CSSF imports into the United States, with numerous other firms each importing significantly smaller amounts," Views at 6, ITC notes the "example" that "the 10 largest responding U.S. importers collectively accounted for 90.2 percent of reported imports in 2008," id. at 6 n.20.  In other words, the other 20 domestic importers that provided usable responses collectively account for 9.8 percent of reported imports in 2008.  However, ITC did not receive responses from 42 firms that each "represent[] greater than one percent of total imports from China or Taiwan under" HSTUS statistical reporting number 7318.15.2030 "in 2008 or in January-June 2009" or that "may have imported more than one percent of total imports from China or Taiwan under the aggregated data of" all six customs numbers during that period. Staff Report at IV-1 n.1, cited in Views at 6 nn.17-18.  (It is not clear whether these data also include 2006 and 2007. Compare Staff Report at IV-1 n.1 with Views at 6 n.16.)  ITC has not explained why the aggregated imports of these 42 firms are necessarily insignificant. See Views; Staff Report.  Indeed, if CSSF imports were to constitute a large majority of the fasteners imported under these customs numbers, see supra note 16, they would necessarily be significant.  Furthermore, neither ITC nor any party has pointed to record evidence comparing the volumes of all imports recorded under these customs subheadings to the volumes of CSSF imports reported in the questionnaire responses. See Views; Staff Report; Plaintiff's Memo; Defendant's Response; Defendant-Intervenors' Response; Plaintiff's Reply.

[19] Indeed, ITC reports without qualification that "[t]he largest foreign producer [in Taiwan] in terms of production . . . estimated that it accounted for . . . [[ a certain ]] percent of all exports of subject merchandise from Taiwan to the United States in 2008." Views at 7 n.22.  This estimate implies that the volume of CSSF exported from Taiwan to the United States in 2008 is [[ significantly larger than ]] the volume reported by responding importers. Compare [[ Foreign Producers'/Exporters' Questionnaire – Largest Taiwanese Producer, at 7 ]] with Staff Report at IV-3.

ITC reaches a different conclusion.  Although it states that reported imports "are somewhat more inclusive than" reported exports with respect to subject merchandise from Taiwan, it also notes a "converse" imbalance with respect to subject merchandise from China. Views at 7 n.25.[20]  The consequence of these opposing imbalances is that "producers in China and Taiwan reported exports of subject merchandise to the United States in collective quantities that are relatively similar to the quantities of subject merchandise imports collectively reported by [domestic] importers for the period examined." Id. at 7.  According to Defendant, this rough equivalence "yet again confirmed that it was reasonable to rely on the importer questionnaire data." Defendant's Response at 32.

That conclusion is untenable.  As Plaintiff notes, "[t]wo wrongs do not make a right, and two incomplete and unreliable data sets do not become reliable through their combination." Plaintiff's Memo at 29.  At the data collection stage of ITC's proceedings, CSSF from China and CSSF from Taiwan are dissimilar; ITC offers no explanation for how undercounting the exports of one can remedy undercounting the imports of the other.[21]  ITC does state that "[r]egardless of which combination of data sets we examine, however, we arrive at the same conclusion," Views at 7 n.25, but identifies neither the analytic paths that it follows nor the particular conclusion to which those paths all lead, see id.

---

[20] Plaintiff also describes as "highly incomplete" the export data for CSSF from China. Plaintiff's Memo at 28.  In particular, "[t]he petition . . . identified nearly 900 producers of CSSF in Taiwan and China, with the majority of these in China.  However, the Commission sent questionnaires to only 34 Chinese producers, and received only 11 responses.  The responding Chinese producers reported exports [to the United States] of [[ a number of ]] tons in 2008.  Responding importers, by contrast, reported entries of [[ a significantly greater amount than ]] that amount of Chinese CSSF over the same time period.  Similar discrepancies exist with respect to all other time periods measured by the Staff." Id. (internal citations to the record omitted).  The Staff Report does not explain how ITC selected particular foreign producers. See Staff Report at I-4, VII-1, 3.

[21] This use of conflation to demonstrate the validity of reported volumes is different from the statutorily authorized use of cumulation to determine the significance of volumes. See 19 U.S.C. § 1677(7)(G).

Because all three potential explanations are illogical, ITC has failed to supply a "reasoned basis," <u>Bowman</u>, 419 U.S. at 286, for characterizing and relying on manifestly incomplete import data as "comprehensive," Views at 4, 6.  To the extent that "the agency's path may [nonetheless] reasonably be discerned," <u>Bowman</u>, 419 U.S. at 285-86, that path appears to involve casual conflation of a limited sample with the larger population from which that sample is drawn.  ITC first treats the reported import volumes as the actual import volumes. <u>See</u> Views at 36-37.  ITC then calculates "apparent U.S. consumption" by summing those reported import volumes with the domestic volumes reported by domestic producers. <u>Id.</u> at 36.[22]  Finally, ITC calculates the "[c]umulated subject imports' share of apparent U.S. consumption" by dividing the reported import volumes by that sum. <u>Id.</u> at 37.  Unless ITC compares its coverage of domestic production with its coverage of foreign imports, that final calculation is meaningless; a group with a comparatively poor response would have an erroneously low calculated market share.[23]  Moreover, the year-to-year trends identified by ITC, <u>see id.</u> at 37, reflect the performance of the responding firms and not necessarily the performance of the potentially fluid groups they represent.  In short, rather than "consider . . . the volume of imports of the subject merchandise,"

_____

[22] The phrase "apparent U.S. consumption" is a term of art that means "the sum of the domestic industry's U.S. shipments and imports from subject and non-subject countries." Citric Acid and Certain Citrate Salts from Canada and China, Investigation Nos. 701-TA-456 and 731-TA-1151-1152 (Final), USITC Pub. 4076 (May 2009) at 19, <u>cited in</u> Letter from Mary Jane Alves, Attorney-Advisor, U.S. International Trade Commission, to Evan J. Wallach, Judge, U.S. Court of International Trade, RE: <u>Nucor Fastener Division v. United States</u>, Court No. 09-00531 (June 24, 2011), Doc. No. 79; <u>see</u> June 23, 2011 Oral Argument at 12:18:10-12:18:22.  There is no indication that use of the word "apparent" implies an estimate. <u>See</u> Views; Staff Report; June 23, 2011 Oral Argument at 12:18:10-12:18:22.

[23] ITC has previously recognized this problem.  In the preliminary determinations affirmed in <u>Torrington</u>, 16 CIT 220, ITC was able to compare its coverage of domestic production with its coverage of foreign imports. <u>See</u> Ball Bearings, Mounted or Unmounted, and Parts Thereof, from Argentina, Austria, Brazil, Canada, Hong Kong, Hungary, Mexico, the People's Republic of China, Poland, the Republic of Korea, Spain, Taiwan, Turkey and Yugoslavia, USITC Pub. 2374 (April 1991) at A-17-18.  Because these two coverage rates were similar, ITC concluded that a comparison of the underlying data was proper. <u>See id.</u> at A-18-19.  ITC also acknowledged explicitly that its "[c]onsumption estimates are understated because not all producers and importers responded to the Commission's questionnaire." <u>Id.</u> at A-18 n.21.

19 U.S.C. § 1677(7)(B)(i), ITC effectively considers only the volume of imports reported by a self-selected subset of a subset.[24]

This is not to say that ITC must obtain perfect information in order to carry out its statutorily mandated task.  The court is aware of the "compromise which the ITC must make between a perfectly accurate and an extremely rapid determination under this complex statute," Atl. Sugar, Ltd. v. United States, 744 F. 2d 1556, 1563 (Fed. Cir. 1984).  In the context of a negative preliminary injury determination, this court does not require complete data. See Comm. for Fair Coke Trade v. United States, 28 CIT 1140, 1163 (2004) (holding that ITC's use of importer questionnaire responses accounting for a quantified majority of imports was not an abuse of discretion); Torrington, 16 CIT at 222 (holding that ITC's use of domestic producer questionnaire responses accounting for a quantified majority of domestic production was not an abuse of discretion).[25]

Nonetheless, a negative preliminary injury determination must still possess "a rational basis in fact." Am. Lamb, 785 F. 2d at 1004 (quoting S. Rep. No. 249, 252, 96th Cong., 1st Sess. 66, reprinted in 1979 U.S.C.C.A.N. 449, 638); see supra Part III.  In a perfect world, that factual basis would include truly comprehensive data on imports—actual volumes, actual market shares, and the actual changes in each throughout the entire POI. See 19 U.S.C. § 1677(7).  In the necessarily imperfect world of antidumping and countervailing duty determinations, see Atl.

---

[24] Although "[t]he term 'industry' means the producers as a whole of a domestic like product, or those producers whose collective output of a domestic like product constitutes a major proportion of the total domestic production of the product," 19 U.S.C. § 1677(4)(A), no party identifies a corresponding provision for importers, see Plaintiff's Memo; Defendant's Response; Defendant-Intervenors' Response; Plaintiff's Reply.

[25] In Fair Coke, the "questionnaire responses report import data from firms accounting for approximately 80% of U.S. imports from China during the period of investigation, and virtually all U.S. imports from Japan during that same period." Fair Coke, 28 CIT at 1163.  In Torrington, the "information provided by the 25 producers represented a substantial majority of domestic production, accounting for an estimated 74%, by quantity, of producers' total shipments of complete ground ball bearings in 1989 and for 68%, by value, of 1989 producers' total shipments of ball complete [sic] ground bearings and parts." Torrington, 16 CIT at 222; see also supra note 23.

<u>Sugar</u>, 744 F. 2d at 1563, that basis must include at least a candid recognition of and response to inherent limitations, <u>see</u> <u>Motor Vehicle Mfrs. Ass'n</u>, 463 U.S. at 43.  ITC's unsupported statement that its limited data are comprehensive demonstrates a complete failure "to consider an important aspect of the problem" and amounts to "an explanation for its decision that runs counter to [its] evidence." <u>Id.</u>  Treating those data as pieces of the full picture is analytical; treating them as the full picture is arbitrary.

**C**

**ITC Identifies, And The Court Discerns, No Rational Basis For Unqualified Reliance On Producer A's Questionnaire Response**

Plaintiff argues that Producer A is not a CSSF producer and hence not part of the domestic "industry" as that term is defined in 19 U.S.C. § 1677(4)(A). <u>See</u> Plaintiff's Memo at 12-15.  In support of this claim, Plaintiff relies primarily on Producer A's questionnaire response. <u>See</u> <u>id.</u>[26]

ITC's domestic producer questionnaire asks the recipient to "[r]eport the value of [its] U.S. shipments of the specified merchandise during the specified periods" and refers the reader to "definitions in the instruction booklet." <u>E.g.</u>, Producer A's Response at II-11.[27]  It segregates the "specified merchandise" into "Fasteners less than 6mm in diameter," "CSSF," "Modified standard fasteners," "Specialty/Patented fasteners," and "Other." <u>Id.</u>  "Specialty/Patented fasteners," in turn, are subdivided into "Automotive," "Aerospace," and "Other." <u>Id.</u>  ITC

---

[26] While conceding that Plaintiff raised to ITC the "issue about whether to include [Producer A] in the domestic industry," Defendant's Response at 18 n.19, Defendant states that Plaintiff did so "solely in a footnote" of its administrative post-conference brief, <u>id.</u> at 16.  Plaintiff states that it also raised this issue in a subsequent email to ITC that is not listed in ITC's administrative record index. <u>See</u> Plaintiff's Memo at 14.  If Plaintiff wants the court to consider this extrarecord evidence, it should make a motion to supplement or amend the administrative record. <u>See</u> <u>Giorgio Foods, Inc. v. United States</u>, Slip Op. 11-27, 2011 Ct. Intl. Trade LEXIS 34 (March 8, 2011).

[27] "Producer A's Response" refers to [[ U.S. Producers' Questionnaire Response of Producer A, as amended by a subsequent supplemental response.  Certain responses changed substantially between the two. ]]

appears to have intended for any given fastener to fall into one and only one of these seven

categories. <u>See</u> Questionnaire Instructions, PL 8 at 5; <u>see also</u> Defendant's Response at 17.[28]

Producer A's response, however, suggests significant confusion.  For each period,

Producer A reported production of [[ fastener type ]], CSSF, [[ fastener type ]], [[ fastener type ]],

and no others. Producer A's Response at II-11.  For each period, the value of those [[ fastener

types]] is equal to the combined value of the [[ fastener types ]] and CSSF. <u>See</u> <u>id.</u>  For 2008, for

example, Producer A reported producing [[ fastener type ]] worth [[ a certain amount ]], CSSF

worth [[ a certain amount ]], [[ fastener type ]] worth [[ a certain amount ]], and [[ fastener type

]] worth [[ a certain amount ]]. <u>Id.</u>  The sum of [[ a certain amount ]] and [[ a certain amount ]] is

[[ a certain amount ]].  In other words, Producer A appears to have classified the same fasteners

as both standard and nonstandard, placing them simultaneously within and beyond the scope of

the investigations.

Other aspects of Producer's A response also suggest confusion about the meaning of

these critical categories.  When asked whether it "produce[s] other products on the same

equipment and machinery used in the production of CSSF," Producer A answered in the

affirmative but then reported that CSSF accounted for 100 percent of its products so produced.

<u>Id.</u> at II-3.  Similarly, when asked whether it "produce[s] other products using the same

production and related workers employed to produce CSSF," Producer A again answered yes but

reported that CSSF accounted for 100 percent of its products so produced. <u>Id.</u> at II-5.  When

---

[28] ITC's Supplemental Memo does not sufficiently address how these categories map onto the scope announced by Commerce. <u>See</u> Supplemental Memo, CL 227 at 1 ("[T]he Commission had already asked questionnaire respondents to report data on fasteners for these automotive and aerospace applications separately."); <u>compare</u> Petition, CL 1 at 6 (excluding "proprietary or modified fasteners used by aerospace and automotive [OEMs]") <u>with</u> Questionnaire Instructions, PL 8 at 5 (excluding "modified standard" fasteners, "proprietary-patented" fasteners, and "engineered special parts") <u>with</u> AD Notice, 74 Fed. Reg. at 54,543 <u>and</u> CVD Notice, 74 Fed. Reg. at 54,547 (each excluding fasteners "produced for an [OEM] part number specific to" an automobile, work truck, medium-duty passenger vehicle, or aircraft); <u>see also</u> <u>supra</u> note 5 and accompanying text.  Indeed, the parties disagree about the meaning of Commerce's exclusions. <u>Compare</u> Plaintiff's Memo at 12-13 <u>with</u> Defendant's Response at 17 <u>and</u> Defendant-Intervenors' Response at 14-15.

asked to compare sub-6mm fasteners with CSSF, Producer A stated that [[ it manufactures a certain type of product ]]. Id. at II-13a.  When asked whether it had produced specialty/patented fasteners, Producer A answered [[ a certain way ]], id. at II-13c , notwithstanding its earlier reporting of [[ another answer ]], id. at II-11.  When asked about the anticipated "negative impact of CSSF from China or Taiwan," Producer A responded that [[ its production differs from other reporting producers ]]. Id. at III-15.  When asked to "identify the principal direct downstream products associated with" its sales of CSSF, Producer A listed [[ products and/or uses that appear incompatible with CSSF ]]. Id. at V-12.  And when asked how "changes in the prices of raw materials affected . . . selling prices and quantities of its U.S.-produced CSSF," Producer A listed only [[ raw material 1 ]] and [[ raw material 2 ]]. Id. at V-13 (emphasis added).  Plaintiff alleges that the production of CSSF, which expressly exclude [[ a fastener type ]], Questionnaire Instructions, PL 8 at 5, would not involve these raw materials. Plaintiff's Memo at 13.[29]

Although Producer A's sales manager did "certify that the information herein supplied in response to [ITC's] questionnaire is complete and correct to the best of my knowledge and belief," Producer A's Response at 1, subsequent correspondence between ITC and Producer A suggests that such knowledge was limited.  In a communication to ITC regarding an unrelated discrepancy in the questionnaire response, [[the staff of Producer A had not familiarized themselves with the agency's definitions of CSSF and other fastener products ]]. [[ Email from Producer A Staff Member, to John Ascienzo, ITC, included in Subsequent Email from Producer A Staff Member, to John Ascienzo, ITC ]].

Defendant points to nothing in the record showing that ITC considered the discrepancies in these data in relation to the scope of the investigations. See Defendant's Response at 14-18;

---

[29] Plaintiff asserts that [[ raw material 1 suggests an excluded product ]] and [[ raw material two also suggests an excluded product ]]. Plaintiff's Memo at 13.

see also Views; Staff Report.  In other words, although ITC "is authorized to weigh evidence and resolve conflicts in the data," Defendant's Response at 18 (citing, inter alia, Am. Lamb, 785 F.2d at 999-1004), there is no indication that it did either in this circumstance.  This apparent omission, which contrasts with the Staff Report's careful analysis of reporting methodology, see infra Part IV.E, prevents the court from identifying a rational basis for the unqualified inclusion of Producer A in ITC's analysis, see Fair Coke, 27 CIT at 776.[30]

## D
## ITC Permissibly Relies On Limited Pricing Data

Plaintiff argues that "ITC erred in relying on pricing data so limited as to be unsupportive of any conclusions at all." Plaintiff's Memo at 21 (capitalization modified).  Plaintiff initially explains, and neither Defendant nor Defendant-Intervenors dispute, that:

> In order to assess subject price effects, the ITC has traditionally solicited quarterly pricing data from U.S. producers and importers, with respect to a limited number of "pricing products."  The ITC then compares quarterly U.S. and import selling prices for the pricing products to determine underselling levels, and reviews trends in U.S. and subject prices to determine whether subject imports have resulted in U.S. price depression and/or suppression.  If the data are to be useful, the ITC must define the pricing products narrowly enough so that differences in the merchandise reported in the pricing product data set do not impugn the reliability or accuracy of the pricing data.  At the same time, the pricing products chosen must be widely sold enough, by both U.S. and foreign producers, to be generally representative of prices for the domestic like product.

---

[30] Although the market share and operating margin data provided in the Staff Report's analysis of reporting methodology suggest that ITC might have reached the same negative preliminary injury determinations had the agency excluded, qualified, or questioned all of Producer A's data, see infra Part IV.E, that is a question for ITC rather than for the court, see supra Part III.  By sustaining ITC's determinations on the basis of such counterfactual speculation, the court would risk impermissibly "substitut[ing] its judgment for that of the agency," Citizens to Pres. Overton Park, 401 U.S. at 416. See SEC v. Chenery Corp., 318 U.S. at 88.

Id. at 21-22 (internal footnote omitted); see Defendant's Response at 33-37; Defendant-Intervenors' Response in Opposition to Plaintiffs' Rule 56.2 Motion for Judgment upon the Agency Record, Doc. Nos. 47, 53 ("Defendant-Intervenors' Response") at 24-27.[31]

In the instant investigations, ITC's price analysis achieved only "limited coverage." Staff Report at V-9 n.29.  As Plaintiff explains:

> Only three of the nine U.S. producers that responded to the Commission's inquiries were able to report sales of any of the four [pricing] products [selected by ITC].  Further, these producers could not consistently report sales of each product across all quarters.  As a result, quarterly U.S. prices were based on, at most, the reported prices of [[a limited number of U.S. producers ]].  All told, the U.S.-produced CSSF represented by the pricing products represented 3.6 percent of reported U.S. commercial CSSF shipments during the [POI].
>
> Pricing product data with respect to subject imports was similarly limited, covering 1.1 percent of reported commercial shipments of [CSSF imported from China] over the POI, and 2.4 percent of reported commercial shipments of [CSSF imported from Taiwan over the POI].  Not all products could be reported for all quarters, and price comparisons were in some cases based on [[ a very limited number of foreign producers ]].

Plaintiff's Memo at 22-23 (internal citations to Staff Report omitted); see also Staff Report at V-8-14.

ITC understood the limited nature of these data: Both the Views and the Staff Report document the same percentages noted by Plaintiff. See Views at 40 n.188; Staff Report at V-8-9. ITC nonetheless concluded that the data are useable. See Views at 38-40.  ITC also found that "[h]igher coverage levels would be difficult to obtain in an industry such as this involving so many product permutations and thus at least tens of thousands of [stock-keeping units]." Id. at 40 n.188 (citing Conference Transcript, PL 46 at 56, 124).  In other words, ITC treats its pricing

---

[31] Plaintiff also states that the selection of appropriate pricing products "often cannot be done at the preliminary phase of the proceeding, and the agency often alters its pricing product choices for the final phase, in order to obtain better quality data." Plaintiff's Memo at 22.  However, the single set of investigations to which Plaintiff cites does not establish that alteration of the pricing products occurs "often." Id.

data as representative.  In contrast, it treats its import volume data as exhaustive. See supra Part
IV.B.

Both ITC and Plaintiff may desire greater coverage, but representative sampling for the
purpose of assessing price effects is not inherently unreasonable or otherwise unlawful. See
Kern-Liebers USA, Inc. v. United States, 19 CIT 87, 114-15 (1995) (affirming negative final
injury determinations), aff'd sub nom. U.S. Steel Grp. – a Unit of USX Corp. v. United States, 96
F.3d 1352, 1366 (Fed. Cir. 1996); Granges Metallverken AB v. United States, 13 CIT 471, 480-
81, 716 F. Supp. 17 (1989) (affirming affirmative final injury determinations).  "Sampling, like
averaging, is a necessary statistical technique without which the Commission's task would be
virtually impossible." U.S. Steel, 96 F.3d at 1366.  The burden of "show[ing] that the sample
relied on by the Commission was not representative" falls on the party challenging that sample,
and "[g]eneral allegations that the [market at issue] is not homogeneous and that small samples
consequently yield skewed results are insufficient to meet this burden." Id.

Although Plaintiff observes that "quarterly U.S. prices were based on, at most, the
reported prices of [[ a limited number of U.S. producers ]]," Plaintiff's Memo at 22, Plaintiff
fails to argue why this sampling is not representative, see id. at 22-23.  It also fails to indicate
which specific producers supplied most of the pricing data. See id.  The court notes that Plaintiff
actually proposed the four pricing products selected by ITC, see Views at 39 n.187, and that
Plaintiff accounts for [[ a substantial ]] percent of reported domestic CSSF production in 2008,
Staff Report at III-2.  Without additional context, Plaintiff's reference to Co-Steel Raritan, Inc. v.
USITC, 31 CIT 58 (2007) is therefore misplaced. See Plaintiff's Memo at 23-25; Co-Steel
Raritan, 31 CIT at 69.

**E**
**ITC Sufficiently Addresses Concerns About Certain Estimated Data**

Plaintiff argues that ITC improperly accepted certain financial data that are based on a methodology criticized in the Staff Report as "seldom reasonable." Plaintiff's Memo at 21 (quoting Staff Report at VI-3 n.1); see id. at 15-21.[32]  According to ITC, of the 36 firms to which it sent domestic producer questionnaires, "9 provided useable data, 7 certified that they had not produced CSSF since January 1, 2006, 8 provided data for fasteners that were no longer considered CSSF once the scope of the investigations was finalized, and 2 provided incomplete responses.  The remaining 10 provided no response." Staff Report at III-1 (internal footnotes omitted).  Of the nine producers that provided "useable" data, Producer A as well as three others "had difficulty preparing profit-and-loss statements for CSSF only, and instead estimated all of their CSSF costs based upon the ratio of CSSF sales to all fastener sales.  As a result, the profit margin for CSSF and all other fasteners was the same." Id. at VI-3 n.1.  Plaintiff infers that this methodology also affected the "CSSF income, profits, [costs of goods sold], and other performance indicators" reported by these particular producers. Plaintiff's Memo at 16.

The Staff Report cogently explains why this methodology is problematic:

The ITC staff discourages producers in any investigation from estimating all of their costs [for the subject merchandise] in [the manner described], because the resulting cost structure and profitability will be the same for any and all products, and this is often not the case.  While it may be reasonable to base some costs, such as [selling, general, and administrative] expenses and interest expense, on the ratio of subject merchandise to all sales, it is seldom reasonable to base cost of goods sold (direct materials, direct labor, and other factory costs) on such a ratio.  Producers must instead review their accounting and cost records and determine the actual costs of the subject merchandise (in this case CSSF).  The problems associated with basing all costs upon the relative sales ratio becomes more

---

[32] Defendant argues that Plaintiff "failed to exhaust its administrative remedies" by not questioning this methodology in arguments to ITC. Defendant's Response at 18 n.19.  However, the Staff Report does provide such a critique, see Staff Report at VI-3 n.1, and "[a] party may be excused from failure to raise an argument before the administrative agency as long as the agency in fact considered the issue," Holmes Prods. Corp. v. United States, 16 CIT 1101, 1104 (1992).

pronounced when the subject merchandise makes up a relatively small portion of the overall sales.  This was the case for [[ some ]] of the four named producers. Finally, the issue becomes particularly pronounced when the overall sales contain a wide mix of high and low value products.  In this particular case, the named producers [[ also produced potentially high-value fasteners ]].

Staff Report at VI-3 n.1.

In contrast to the Staff Report, the Views refer only to the combined data "without comment or acknowledgment." Plaintiff's Memo at 18; see Views at 44-45.  The court's task would be simpler if the Views also recognized the limitations of these data or additionally considered whether the CSSF-specific dataset demonstrates material injury that the total dataset does not.  Instead, the Views merely describe the industry's financial performance through exclusive reference to that total dataset. See Views at 44-45 (describing unit sales, operating income, and operating margin).

However, the Staff Report also places the data problem in context, which permits the court to discern, however tenuously, ITC's analytical path. See Staff Report at VI-3 n.1.  The producers reporting general data "accounted for [[ a relatively small ]] percent of sales values every period." Id.  In addition, the combined profit margin for all nine responding producers closely tracks the combined profit margin for the producers reporting CSSF-specific data. See id. at VI-2, VI-3 n.1.  This is because two of the firms reporting CSSF-specific data account for a substantial majority of reported domestic production. See id. at III-2.  Accordingly, even though Plaintiff is correct that the general estimates may "skew" the nominally CSSF-specific performance data used by ITC, Plaintiff's Memo at 16, the analysis provided in the Staff Report demonstrates that this skew is minimal, see Staff Report at VI-3 n.1.  Given ITC's own Staff Report, the court must conclude that ITC understood such a distortion to be both possible and negligible. See Dastech, 21 CIT at 477.  The methodology at issue, while flawed, is not fatal to

ITC's determinations. See Conn. Steel Corp. v. United States, 30 CIT 1658, 1669 (2006)

(sustaining preliminary determinations that were based in part on domestic producer estimates);

cf. Atl. Sugar, 744 F.2d at 1562 (holding that overinclusion did not fatally distort ITC's final

determinations).[33]

### F
### ITC Sufficiently Addresses Allegations Of Injury Made By Domestic Producers

ITC also found "no likelihood that any evidence we would have obtained in any final

phase of these investigations would change our determinations that there is no reasonable

indication that the domestic industry is materially injured or threatened with material injury by

reason of subject imports from China and Taiwan." Views at 9; see Plaintiff's Memo at 31-39.

At the outset, the reasons for remand discussed above compel reconsideration of this finding. See

supra Parts IV.B, C; cf. Plaintiff's Memo at 38-89.  Plaintiff further argues that "specific

information" on the record shows that final investigations would likely uncover evidence of

material injury or threat thereof. Plaintiff's Memo at 31.

In support of its argument, Plaintiff relies on, inter alia, questionnaire responses

submitted by six domestic producers accounting for [[ a very significant ]] percent of reported

2008 production. See id. at 33-34, 37; see Staff Report at III-2.  One portion of that

questionnaire, under "financial information," asks each recipient whether it "experienced any

actual negative" financial effects "as a result of imports of CSSF from China or Taiwan" and

whether it "anticipate[s] any negative impact of" such imports. E.g., Nucor's Questionnaire

Response, CL 101 at III-14-15 (capitalization modified).  All six producers referenced by

---

[33] Atl. Sugar, which applies the substantial evidence standard to an ITC determination under a different statute, also warns against "inflating out of all proportion the importance of the laws with which the lower court deals [by] expect[ing] that business people and corporate accountants would keep their books with an eye to an obscure and wholly arbitrary statutory geographic region, which a relatively small Government agency might declare for the purposes of one antidumping injury investigation." Atl. Sugar, 744 F.2d at 1561.

Plaintiff reported negative financial effects; multiple firms selected [[ a variety of such effects from among a list provided in the questionnaire ]]. Plaintiff's Memo at 33-34 (quoting questionnaire responses); Staff Report at VI-13 (same).  Some also alleged other negative impacts, actual or anticipated, see Plaintiff's Memo at 33-34, 37 (quoting questionnaire responses); Staff Report at VI-13-14 (same), with one producer stating that [[ changes in subject marketing strategies may increase the negative effects of subject imports ]], Plaintiff's Memo at 34 (quoting questionnaire response); Staff Report at VI-13 (same), and another describing how imports had [[ resulted in changes to product mix in an effort to reduce injury ]], Plaintiff's Memo at 34 (quoting questionnaire response).

Defendant argues that such "anecdotal data" do "not outweigh the hard statistical data relied on by the Commission"[34] and that, regardless, it "is decidedly not the Court's role" to "re-weigh the evidence." Defendant's Response at 38.  Defendant-Intervenors add that, because such declarations of injury "are normally contained in the petition itself or can be easily collected by simply sending questionnaire responses to only domestic producers[, a]llowing an investigation to proceed to the final stage based solely on the unsubstantiated allegations of interested parties would make the statutory requirement of a preliminary investigation meaningless." Defendant-Intervenors' Response at 33.[35]

ITC weighed the allegations cited by Plaintiff and expressly concluded that "contrary to [the] claims otherwise, we do not find that the declines in the domestic industry's performance that occurred during the period examined were attributable to cumulated subject imports to any significant degree." Views at 50 (citing Staff Report at VI-12-14 (documenting the allegations)).

---

[34] But see, e.g., supra Part IV.B.

[35] But see Defendant-Intervenors' Response at 15-16 (noting that "[f]irst, as part of its questionnaire response, [Producer A] was required to certify to the completeness and accuracy of the information it was submitting").

Although ITC could have done more to explicitly "explain or counter" these allegations, Usinor, 26 CIT at 783, it has done enough to satisfy the applicable standard of review, see supra Part III.

Plaintiff's argument with respect to a different portion of the domestic producer questionnaire also fails. See Plaintiff's Memo at 32-33 n.15. That portion, under "competition from imports," asks whether the recipient "[r]educe[d] prices" or "[r]olled back announced price increases" in order to "avoid losing sales to competitors selling CSSF from China and/or Taiwan" and whether it "los[t] sales of CSSF to imports of these products from China and/or Taiwan." E.g., Nucor's Questionnaire Response, CL 101 at VII-2-3 (capitalization modified). In contrast to the financial questions, these questions request detailed documentation of specific transactions. Compare id. at III-14-15 with id. at VII-2-3. Several producers alleged such lost revenue or lost sale transactions. See Views at 40 n.190; Staff Report at V-24-27. ITC stated that the agency investigated allegations for which these domestic producers had "provided limited information" but "generally was unable to substantiate them." Views at 40 n.190. ITC also concluded that Plaintiff "failed to provide adequate details to support" its petition allegations and had been inconsistent, incomplete, or untimely in its responses. Id. Plaintiff argues that "ITC has made it nearly impossible for U.S. producers in any investigation to provide information sufficient to result in a 'substantiated' claim, due to the specificity of the information that the agency requires before it will investigate." Plaintiff's Memo at 32 n.15.[36]

This argument is unpersuasive for two reasons. First, the record suggests that Plaintiff's conduct impeded investigation into its own allegations of lost revenues and sales. See Views at 40 n.190 (implying that Plaintiff acted inconsistently); Staff Report at [[ a certain page (The staff

---

[36] Plaintiff continues: "In particular, the agency requires a firm making a lost revenue or sales allegation to identify the specific product, the exact date upon which a rejected price quote was first made, the exact quantity of product subject to that quote, the rejected U.S. price, any subsequently accepted lower U.S. price, the exact amount of the subject producer's quote, and the country of origin." Plaintiff's Motion at 32 n.15.

report describes Plaintiff's conduct during the investigation) ]]; Plaintiff's Motion at 33 n.15

(suggesting that Plaintiff chose not "to present formal lost sales allegations").  Second, the record

shows that ITC pursued nine allegations made by other producers and found that the majority

were disputed by the pertinent purchasers. See Views at 40 n.190; Staff Report at V-24-27.  In

short, Plaintiff has not demonstrated that ITC's assessment of lost revenues and sales involved

any abuse of the "broad discretion" to which the agency is entitled. Diamond Sawblades Mfrs.

Coal. v. United States, Slip Op. 2008-18, 2008 Ct. Intl. Trade LEXIS 25 at *29 (February 6,

2008) (applying the substantial evidence standard).


## V
## CONCLUSION

For the reasons stated above, this matter is REMANDED to ITC for action consistent

with this opinion.


                                        __/s/ Evan J. Wallach_____
                                        Evan J. Wallach, Judge

Dated: August 11, 2011
       New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| ———————————————— : | |
| NUCOR FASTENER DIVISION,                : | |
| : | |
| Plaintiff,                : | |
| : | Before:        WALLACH, Judge |
| v.                : | Court No.:     09-00531 |
| : | |
| UNITED STATES,                : | |
| : | |
| Defendant,                : | |
| : | |
| and                : | |
| : | |
| XL SCREW CORPORATION, et al.,                : | |
| : | |
| Defendant-Intervenors.                : | |
| ————————————————: | |

## **ORDER**

This case having come before the court upon Plaintiff's Motion for Judgment on the

Agency Record ("Plaintiff's Motion"); the court having reviewed all papers and pleadings on file

herein, having heard oral argument by each party, and after due deliberation, having reached a

decision herein; now, in conformity with said decision, it is hereby

ORDERED that Plaintiff's Motion is GRANTED; and it is further

ORDERED that this matter is REMANDED to the U.S. International Trade Commission

for action consistent with the opinion accompanying this order ("the Opinion"); and it is further

ORDERED that all parties shall confer and submit, jointly if possible, no later than

September 12, 2011 a proposed schedule for submission of remand determinations, responses to

those determinations, and replies to those responses; and it is further

ORDERED that each party shall review the Opinion and shall in writing no later than

August 18, 2011 notify the court whether any information contained in the Opinion is

confidential, identify any such information, and request the deletion of any such information

from the public version of the Opinion to be issued thereafter.  If a party determines that

information is confidential, it shall propose alternate <u>descriptive</u> language to replace such

information.  If a party determines that no information is confidential, it shall so notify the court

in writing no later than August 18, 2011.


                                        __/s/ Evan J. Wallach____
                                        Evan J. Wallach, Judge

Dated: August 11, 2011
        New York, New York