Slip Op. 13-65

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| NUCOR FASTENER DIVISION,<br><br>                    Plaintiff,<br><br>v.<br><br>UNITED STATES,<br>                    Defendant,<br><br>and<br><br>PORTEOUS FASTENER CO., HEADS & THREADS INTERNATIONAL, LLC, SOULE, BLAKE & WECHSLER, INC., INDENT METALS LLC, XL SCREW CORPORATION, BOSSARD NORTH AMERICA, HILLMAN GROUP, FASTENAL CO., FASTENERS AND AUTOMOTIVE PRODUCTS, BRIGHTON-BEST INTERNATIONAL, INC., and BRIGHTON-BEST INTERNATIONAL (TAIWAN) INC.,<br>                    Defendant-Intervenors. | Before: Richard W. Goldberg,<br>United States Judge<br>Court No. 09-00531<br><br>**PUBLIC VERSION** |

### OPINION AND ORDER

[Defendant's remand redetermination is sustained and plaintiff's request for a final investigation is denied.]

Dated: May 24, 2013

*Daniel B. Pickard*, Wiley Rein LLP, of Washington, DC, argued for plaintiff. With him on the brief were *Alan H. Price* and *Maureen E. Thorston*.

*Mary J. Alves*, United States International Trade Commission, of Washington, DC, argued for defendant. With her on the brief were *James M. Lyons*, General Counsel, and *Neal J. Reynolds*, Assistant General Counsel for Litigation.

*Matthew T. McGrath*, Barnes Richardson & Colburn LLP, of Washington, DC, argued for defendant-intervenor. With him on the brief was *Stephen T. Brophy*.

Goldberg, Senior Judge:  Plaintiff Nucor Fastener Division ("Nucor"), a domestic producer of nuts, bolts, and other fasteners, seeks judicial review of the International Trade Commission's ("the ITC" or "the Commission") remand redetermination from its preliminary antidumping and countervailing duties investigations into *Certain Standard Steel Fasteners from China and Taiwan*, USITC Pub. 4109, Inv. Nos. 701-TA-472 and 731-TA-1171-1172 (Nov. 2009) ("ITC Pub. 4109").  On remand, Nucor argues that the ITC did not properly address the concerns of the Court of International Trade when it reaffirmed its findings that the data it used to determine that Chinese and Taiwanese importers were not dumping was comprehensive and that Producer A was properly included into its analysis because it was, indeed, a domestic producer.

For the reasons discussed below, the ITC's remand redetermination is sustained and Nucor's request for a final investigation is denied.

## BACKGROUND

On September 23, 2009, petitioner Nucor Fastener Division of St. Joseph, Indiana, filed a petition with the ITC alleging that U.S. producers of certain standard steel fasteners ("CSSF") were materially injured and threatened with material injury by reason of sales at less than fair value ("LTFV") and subsidized imports of CSSF from China and sales at LTFV of CSSF imported from Taiwan.  The ITC initiated both a countervailing duty investigation and an antidumping duty investigation.

In preliminary antidumping and countervailing duty determinations, the ITC determines whether there is a reasonable indication that a domestic industry is materially injured or threatened with material injury, or that the establishment of an industry is materially retarded, by reason of the allegedly unfairly traded imports.  19 U.S.C. §§ 1671(b)(a), 1673b(a) (2006). To

reach that determination, the ITC weighs the evidence before it and determines whether: "(1) the record as a whole contains clear and convincing evidence that there is no material injury or threat of such injury; and (2) no likelihood exists that contrary evidence will arise in a final investigation." *Am. Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed. Cir. 1986).

In determining whether the domestic industry has suffered material injury or faces the threat of such injury, the ITC considers factors such as the volume of subject imports, the subject imports' effect on prices for the domestic like product, and the subject imports' impact on domestic producers of the domestic like product in the context of U.S. operations. 19 U.S.C. § 1677(7)(B)(i). The ITC considers all relevant economic factors that impact the U.S. industry, with no single factor being dispositive. *Id.* § 1677(7)(C)(iii). All factors are considered within the context of the business cycle and competitiveness of the affected industry. *Id.*

On November 9, 2009, after conducting a preliminary investigation, the ITC found: (1) the record as a whole contained no reasonable indication of material injury by reason of cumulated subject imports from China and Taiwan; and (2) the record as a whole contained no reasonable indication of a threat of material injury by reason of cumulated subject imports. *See generally* ITC Pub. 4109. The ITC based its determination on the following factors: the conditions of competition and the business cycle (including demand conditions, supply conditions, raw material costs, and interchangeability), the volume of cumulated subject imports from China and Taiwan, the price effects of the cumulated subject imports, and the impact of the cumulated imports. *Id.* at 38–45. The ITC's determination that no threat of material injury existed was based on its consideration of likely subject import volumes, likely price effects, and likely impact. *Id.* at 41–50.

Although the ITC found that the cumulated volume of subject imports from China and Taiwan was significant in absolute terms and that subject imports were pervasively undersold, the ITC determined that there was no overall correlation between the large and steady volume of subject imports and the changes in the domestic industry's conditions and prices. *Id.* at 36–45. First, between 2006 and 2008, as demand somewhat declined, the ITC did not observe any significant changes that would indicate that subject imports were impinging upon the domestic industry's market share. *Id.* at 36–38. Rather, market share across the domestic industry, subject imports, and imports from countries outside of China and Taiwan remained stable. *Id.* Second, the ITC did not observe any negative price effects, as domestic industry prices tended to remain at or above their initial-period prices. *Id.* at 38–41. Moreover, the domestic industry's "cost of goods sold as a share of net sales," the ratio the ITC commonly uses to analyze price suppression, was relatively low and stable between 2006 and 2008. *Id.* at 40–41. Notwithstanding small declines in demand, a significant subject-import market share, and significant underselling from 2006 to 2008, the ITC found increased profitability and solid performance. *Id.* at 36–45.

Even during the 2009 economic downturn, which saw noticeable declines in demand by consumers of CSSF, the ITC determined that slight declines in domestic market share (24.5 percent in 2008 to 23.3 percent in 2009) were the result of an increase in market share by non-subject imports as opposed to those from China and Taiwan. *Id.* at 38. With respect to price effects, the cost of goods to net sales ratio was higher in 2009 as a result of price declines in response to the recession, not as a result of the volume of subject imports. *Id.* at 41. Underselling was not any more pervasive in 2009 than in any prior years. *Id.* Although lower sales and profitability ensued, as expected, from the recession, the domestic industry managed to

earn $3.8 million in operating income ($11.4 million in 2008) and maintained a positive 5.8 percent operating margin (12.2 percent in 2008). *Id.* at 24–45. Thus, the ITC found that the record as a whole contained clear and convincing evidence of no reasonable indication of material injury by reason of cumulated subject imports of CSSF from China and Taiwan and no likelihood that contrary evidence would be discovered in any final investigation. *Id.* at 9, 36–45.

In considering whether there was any reasonable indication of a threat of material injury to the domestic producers, the ITC did not find a likelihood of substantially increased imports from China and Taiwan. *Id.* at 47. Although the Chinese and Taiwanese producers of CSSF had excess capacity, were export-oriented, and undersold CSSF in the U.S. market, the record data showed that their market share remained relatively stable. *Id.* at 47–48. The ITC also found that the industries in China and Taiwan were unlikely to change very much in the near future. *Id.* at 48–49. These factors, along with the fact that subject import pricing did not stimulate demand for significant additional subject imports during the investigation period, led the ITC to determine that subject imports were unlikely to constitute a threat of material injury to domestic producers. *Id.* at 49.

On May 14, 2010, Nucor moved for judgment on the agency record pursuant to USCIT Rule 56.2, challenging the ITC's preliminary determination results. Br. in Support of Nucor Fastener Division's Rule 56.2 Mot., D.E. 32, at 1 ("Pl.'s Mem."). On August 11, 2011, this court granted in part and denied in part Nucor's motion. *Nucor Fastener Div. v. United States*, 35 CIT __, 791 F. Supp. 2d 1269 (2011). The court reversed and remanded back to the ITC the following two issues: (1) the ITC's treatment of its import data as comprehensive; and (2) the ITC's unqualified reliance on Producer A's (which identified itself as a U.S. producer of domestic like product) questionnaire response. *Id.* at __, 791 F. Supp. 2d at 1292.

The court agreed with Nucor's challenge of the ITC's description of the importer questionnaire data as comprehensive. It identified "three potential explanations" for the ITC's conclusion and argued that each was illogical. Pl.'s Mem. at 26. First, Nucor questioned the ITC's assertion that the "responses ultimately received from [the thirty importers] represented the large majority of known CSSF imports from January 2006 and June 2009." *Id.* The ITC explained that it compared the importers responsible for the thirty responses "to its initial list of 78 firms that appeared to be the major importers of all types of steel fasteners covered by these [Customs] subheadings." Mem. of Def. U.S. ITC in Opp'n to Pl.'s Mot. for J. on the Agency R., D.E. 45, at 30–31 ("Def.'s Mem."). The ITC was thus able to "determine that they had received data from the large majority of significant known imports of fasteners from China and Taiwan" during the period of interest, which indicated that they had proper coverage for importers who likely imported CSSF. *Id.* at 31. The court called the ITC's contention "entirely post hoc," pointing out that the ITC "cite[d] no record evidence of any such comparison." *Nucor*, 35 CIT at __, 791 F. Supp. 2d at 1281. Moreover, the ITC's argument was undermined by its assertion that five of the six relevant Customs subheadings "contain[] large amounts of fasteners not subject to these investigations." *Id.* The court also questioned whether the ITC meant "significant known importers" as opposed to "significant known imports," but noted that the ITC's response was unclear. *Id.*

Second, Nucor questioned how the thirty questionnaire responses demonstrated that a small number of firms accounted for a significant share of CSSF imports, asserting that the data merely showed that a small number of firms accounted for a large share of "reported" imports. Pl.'s Mem. at 27. The ITC defended its views with staff conference testimony that "this industry involved a limited number of large importers." Def.'s Mem. at 31. However, the court

questioned the ITC's response because it had not provided any record evidence even suggesting an overlap between large importers that responded to the questionnaire and the large reporters referenced at the staff conference. *Nucor*, 35 CIT at __, 791 F. Supp. 2d at 1281–82. Moreover, the ITC did not explain how the sample of responding importers was demonstrative of the "universe of relevant importers." *Id.* at __, 791 F. Supp. 2d at 1282.

Third, Nucor questioned the ITC's use of importer data as comprehensive, considering that a comparison of U.S. importer responses to foreign producer responses indicated that reported exporter volume exceeded the reported importer volume by a significant percentage. Pl.'s Mem. at 27–30. The ITC cited a rough equivalence in the values because, although reported imports were more inclusive than reported exports in Taiwan, the opposite was true in China, thus resulting in "reported exports of subject merchandise to the United States in collective quantities that are relatively similar to the quantities of subject merchandise imports collectively reported by [domestic importers]." ITC Pub. 4109 at 7. The court rejected this reasoning because the ITC offered "no explanation for how undercounting the exports of one can remedy undercounting the imports of the other." *Nucor*, 35 CIT at __, 791 F. Supp. 2d at 1282. Moreover, the ITC did not provide any methodologies to support its assertion that it would arrive at the same conclusion regardless of which combination of data sets it examined. *Id.*

In sum, the court concluded that the ITC had failed to provide a "reasoned basis" for treating and relying on incomplete data as comprehensive, calling the ITC's approach a "casual conflation of a limited sample with the larger population from which that sample is drawn." *Id.* The basis upon which the ITC was required to draw its conclusion "must include at least a candid recognition of and response to inherent limitations." *Id.* at __, 791 F. Supp. 2d at 1285. Therefore, the ITC's treatment of the data amounted to a "complete failure 'to consider an

important aspect of the problem.'"  *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The court also remanded on the issue of the ITC's reliance on Producer A's response and inclusion as a domestic CSSF importer.  Nucor had challenged the ITC's inclusion of four firms that reported producing CSSF and argued that one of these firms (Producer A) did not produce the domestic like product (CSSF) and should not be included as a member of the domestic industry.  Nucor claimed that Producer A's response was unreliable because the response suggested significant confusion.  Pl.'s Mem. at 12–15, 17.  For example, Producer A classified the same fasteners as standard and nonstandard.  Moreover, when asked whether it "produce[d] other products on the same equipment and machinery used in the production of CSSF," Producer A answered affirmatively but responded that CSSF accounted for 100 percent of its products.  *Id.*  Subsequent correspondence between the ITC and Producer A showing that Producer A staff were not familiar with the ITC's definitions of CSSF and other fastener products also suggested that the staff's knowledge and ability to respond to the questionnaires was limited.  Although the ITC had asserted that it was "authorized to weigh evidence and resolve conflicts in the data," Def.'s Mem. at 18, the court found that the ITC did not demonstrate that it even considered any discrepancies.  *Nucor*, 35 CIT at __, 791 F. Supp. 2d at 1287.  Therefore, there was no rational basis for the unqualified inclusion of Producer A in the ITC's analysis.  *Id.*

On December 7, 2011, on remand, the ITC reaffirmed all of the findings from its original negative preliminary determinations because neither of these remanded issues played more than a small role in its overall analysis and determinations.  Certain Standard Steel Fasteners from China and Taiwan, USITC Pub. 4297, Inv. Nos. 701-TA-472 and 731-TA-1171 (Preliminary)

(Remand) (Dec. 2011), D.E. 91, at 11 ("Remand Results").[1]  It again concluded that there is no reasonable indication that an industry in the United States is materially injured or threatened with material injury by reason of subject CSSF imports from China and Taiwan.  *Id.*

## STANDARD OF REVIEW

"The court will sustain the Department's determination upon remand if it complies with the court's remand order, is supported by substantial evidence on the record, and is otherwise in accordance with law."  *Jinan Yipin Corp. v. United States*, 33 CIT __, __, 637 F. Supp. 2d 1183, 1185 (2009) (citing 19 U.S.C. § 1516(b)(1)(B)(i) (2000)).

## DISCUSSION

**I.  The record supports the ITC's using its import questionnaire data as "comprehensive"**

The court concluded that the ITC had failed to provide a "reasoned basis" for treating and relying on incomplete data as comprehensive, calling the ITC's approach a "casual conflation of a limited sample with the large population from which the sample is drawn."  *Nucor*, 35 CIT at __, 791 F. Supp. 2d at 1283.  The court noted that the ITC's conclusion "must include at least a candid recognition of and response to inherent limitations" in its data and methodology.  *Id.* at __, 791 F. Supp. 2d at 1285.  Therefore, the ITC's treatment of the data amounted to a "complete failure 'to consider an important aspect of the problem.'"  *Id.* (quoting *Motor Vehicle Mfrs. Ass'n*, 462 U.S. at 43 (1983)).

On remand, after comparing the importer questionnaire data to Customs's import data, other record data concerning the relative size and number of importers in the industry, and foreign producer questionnaire data, the ITC again deemed importer questionnaire data

---

[1] The Remand Results are also available online at http://www.usitc.gov/publications/701_731/pub4297.pdf. However, because the Remand Results published online have different pagination from those filed with the court, the court notes that all page numbers cited by the court refer to the Remand Results filed with the court. They are available as part of the public record, docket entry number 91.

comprehensive and reliable.  For the reasons stated below, the court sustains the Commission's remand determinations.

**A. The Record Supports Using Questionnaire Data on CSSF Imports from Subject and Non-Subject Countries**

The ITC argues that its use of importer questionnaire data is preferred over Customs's import data because the merchandise covered by the investigations could be classified under any one of six statistical reporting numbers under the Harmonized Tariff Schedule of the United States ("HTSUS"), with five out of the six numbers representing "basket" categories containing numerous fasteners not subject to the investigations.  Remand Results at 22–25.  Moreover, using only the sixth number would underestimate the volume of subject imports.  *Id.* at 24.  The ITC states that Nucor itself has also counseled against using Customs's import data, urging the ITC to use importer questionnaire responses instead.  *Id.* at 23.  Additionally, the ITC emphasizes that the Federal Circuit has given it broad discretion in making methodological choices, and has routinely upheld the ITC's use of importer questionnaire data, that need not be complete.  *Id.* at 22 (citing *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357, 1361–62 (Fed. Cir. 1996); *Comm. for Fair Coke Trade v. United States*, 28 CIT 1140, 1163 (2004); *Sensient Techs. Corp. v. United States*, 28 CIT 1513, 1520–22 (2004).

Second, the ITC defends the process it used to collect the importer questionnaire data. After obtaining Commerce's official statistics (from  its "Interactive Tariff and Trade DataWeb") on imports under the six HTSUS statistical reporting numbers that Nucor identified, the ITC obtained specific import entry information for U.S. imports from subject and non-subject countries for the six statistical reporting numbers (from Customs Net Import File CL202) and issued importer (and foreign producer) questionnaires to firms that accounted for a significant portion of imports (or exports) of all fastener types to the United States.  Remand Results at 25–

26. Using the data it obtained from the file, ITC staff separated the importers into three groups ("Groups A, B, and C"). *Id.* at 27. Group A consisted of firms representing greater than one percent of total imports of fasteners from China and Taiwan under statistical reporting number 7318.15.2030, which Nucor identified as most closely resembling CSSF, in 2008 or January through June 2009. *Id.* at 26–27. Group B included firms representing greater than one percent of total imports of fasteners from China and Taiwan under the combined statistical reporting numbers (7318.15.2030, 7318.15.2055, 7318.15.2065, 7318.15.8065, 7318.15.8085, and 7318.16.0085), which covered subject and non-subject CSSF, during the same time period. *Id.* at 28. Group C was comprised of firms that imported greater than one percent of the total imports of the combined statistical reporting numbers from non-subject countries during the same period. *Id.*

Although the ITC acknowledges that it never obtains perfect data on imports, foreign producers, or the domestic industry in any investigation, it states that it routinely relies on this data to make injury determinations because the statute, 19 U.S.C. §§ 1671b(a)(1)–(2), 1671b(f), 1673b(a)(1)–(2), 1673b(f), requires decisions to be made within a relatively short forty-five day period based on information available at the time. Remand Results at 26–27. Moreover, the ITC emphasizes that each of the steps taken is consistent with its regular practice in preliminary injury investigations. *Id.* at 25–27.

Nucor argues that "the record did not bear out the [ITC's] description of its methodology," pointing out that individual importers responsible for certain goods from China and Taiwan during the relevant time periods were not included in the ITC's questionnaire mailing list, while importers responsible for minimal or no imports from China and Taiwan were included. Nucor Fastener Div.'s Remand Comments, D.E. 102, at 16–19 ("Pl.'s Remand

Comments"). Moreover, Nucor points out "the still greater oddity of questionnaires being sent to companies that <u>did not</u> meet the criteria." *Id.* at 19. In response, the ITC refers back to its extensive explanations regarding its methodologies for sending out the questionnaires in its Remand Results, pointing out that it does not ordinarily specify whether and why it sent questionnaires to specific firms. Def. U.S. ITC's Reply to Nucor's Response, D.E. 115, at 11 ("Def.'s Reply to Remand Comments"). Moreover, the ITC notes that Nucor did not inquire about any of these specific firms at the remand proceedings and therefore failed to exhaust its administrative remedies on this issue. *Id.* at 12. Accordingly, there is no need for another remand for the ITC to explain the status of additional firms.

Although the ITC acknowledged that the data is not complete and that some discrepancies existed, *id.* at 43, the court agrees with the ITC that the data was sufficiently adequate to rely upon for purposes of the investigation.

**B. There Is No Need to Proceed to a Final Investigation on the Import Data Issue**

In its Remand Comments, Nucor continues to assert that because the importer questionnaire data was "spotty and unreliable," additional import volumes and pricing data might lead to a finding of greater underselling and import penetration than originally found. Pl.'s Remand Comments at 39–40. Defendant-Intervenors respond that, although the import data may not be comprehensive, the ITC has collected enough import data to reach a negative injury determination and there is no need to proceed with a final investigation. Def.-Ints.' Comments on the Remand Det. of the U.S. ITC, D.E. 100, at 5 ("Def.-Ints.' Remand Comments"). The ITC correctly maintains that in preliminary investigations, the standard is not whether any <u>additional</u> data could be collected in any final investigations, but instead whether the record as a whole indicates a likelihood that contrary evidence leading to a different outcome could be obtained.

Remand Results at 44 (citing *Co-Steel Raritan, Inc. v. United States*, 357 F.3d at 1294, 1311, 1314–17) (Fed. Cir. 2004) (emphasis in original).

In its original views, the ITC found that regardless of which data sets it reviewed, it still arrived at the same conclusion. *Id.* at 44. On remand, the ITC again asserts that it would reach a negative injury determination even if it relied on the data set that showed the greatest number of cumulated subject imports. *Id.* at 45. Moreover, the ITC's findings regarding large but steady subject import market share, steady domestic industry market share, no significant price depression or suppression, and a profitable domestic industry despite significant underselling would also remain the same. *Id.* Therefore, absent a reasonable indication of material injury or threat thereof, there is no need to proceed with a final investigation to gather more comprehensive data that will yield the same results. *Id.* at 46.

Nucor's arguments are unavailing. The court remanded the issue of whether the record supported the ITC's import questionnaire data as comprehensive because the ITC had failed to acknowledge the inherent limitations in its methodology and thus had failed to consider a critical aspect of the problem. In its remand results, the ITC provided a detailed explanation of its methodology, including why it chose to use importer questionnaire data over Customs data, how it collected the data, and how it analyzed the data. Vitally, the ITC admitted that it never obtains perfect data on imports, foreign producers, or the domestic industry in any investigation, given the constraints of the statute (19 U.S.C. §§ 1671b(a)(1)–(2), 1671b(f), 1673b(a)(1)–(2), 1673b(f)) and its forty-five day limitation.

Nucor's assertions regarding the ITC's failure to include certain firms in its analysis and the ITC's failure to obtain perfect coverage in its samples miss the point of the court's remand instructions—to acknowledge that the ITC's investigatory methods were imperfect. The ITC has

gone above and beyond in that regard, thereby nullifying any need to proceed with a final investigation. The court therefore sustains the ITC's remand redetermination that the record supports using questionnaire data on imports into the United States of CSSF from subject and non-subject countries.

**II.   The ITC's Reliance on Producer A's Questionnaire Response and Inclusion of Producer A as a Domestic Producer Was Not Unreasonable**

Although the ITC had asserted that it was "authorized to weigh evidence and resolve conflicts in the data," the court pointed out that the ITC did not properly show that it even considered any discrepancies. *Nucor*, 35 CIT at __, 791 F. Supp. 2d at 1287. Therefore, there was no rational basis for the unqualified inclusion of Producer A in the ITC's analysis. *Id.*

The ITC again affirmed its findings that Producer A was properly included as a producer of domestic like product. For the reasons stated below, the court sustains the ITC's remand redetermination.

**A. The Record Supports Inclusion of Producer A as a Domestic Producer of CSSF**

The ITC argues that the record supports the inclusion of Producer A as a domestic producer for the following reasons. First, Producer A certified in its questionnaire response that it is a producer of the domestic like product CSSF. Remand Results at 11. Although the court concluded that Producer A appeared confused about the scope of the investigations, the ITC argues that confusion as to scope is unlikely because Producer A's officials candidly admitted that they had not read the instructions at the time they filed the initial questionnaire response and later submitted an amended questionnaire response with revised answers to several questions pertaining to numerical data. *Id.* at 13–17. Second, the statute defines the domestic industry as "the producers as a whole of a domestic like product or those producers whose collective output

of a domestic like product constitutes a major proportion of the total domestic production of the product." *Id.* at 11 (quoting 19 U.S.C. § 1677(4)(1)).

Nucor argues that Producer A makes only "Product X" (note: the remand comments have redacted the name of the product), which falls outside of the scope of the investigations. Pl.'s Remand Comments at 37–38. Moreover, the court faulted Producer A for classifying the same fasteners as both standard and nonstandard (within scope and outside of scope). *Nucor*, 35 CIT at __, 791 F. Supp. 2d at 1286. In response, the ITC argues that Producer A's statement that it produces fasteners used for a certain purpose (outside of scope) does not indicate that it is not a producer of CSSF because Producer A reported revised allocations for U.S. shipments of CSSF and non-CSSF producers upon clarification with the ITC and its previous responses were given at a point when Producer A's officials had not read the instructions or coordinated with one another. Remand Results at 15–16.

Finally, the ITC argues that it is entitled to rely on a firm's certified statements about its own internal operations and to weigh evidence and resolve conflicts in the data. *Id.* at 11, 17. Despite Nucor's different readings of the scope language and its showing that Producer A did not revise its answer to every question in its amended response, the ITC found that the record as a whole warrants relying on Producer A's certified statements that it produced at least some CSSF and therefore including it as a domestic producer. *Id.* at 17.

### B. Producer A accounts for such a small portion of domestic CSSF that its inclusion will not meaningfully affect the data, data trends, or the ITC's causation analysis

On remand, the ITC explains that because Producer A accounts for such a small fraction of domestic CSSF production, inclusion (or exclusion) would not change the outcome of the negative injury determination. *Id.* at 18. It points out that even the court acknowledged that the market share and operating margin data may suggest that the ITC might have reached the same

negative preliminary injury determinations had the agency excluded, qualified, or questioned all of Producer A's data. *Id.* (referring to *Nucor*, 35 CIT at __, 791 F. Supp. 2d at 1287, n.30). Nucor argues that including Producer A in the domestic industry would "meaningfully alter[] the picture of the U.S. industry." Pl.'s Remand Comments at 39. After considering the record data with and without Producer A in the domestic industry, the ITC found that Producer A's presence or absence had no meaningful impact on the data or trends (e.g., domestic industry production, shipments, operating income, operating margins) or causation analysis (e.g., stable market shares, no effect on underselling or lack of significant price depression). Remand Results at 18. Therefore, the ITC concluded that there is no need to proceed with a final investigation.

    Nucor's arguments are unconvincing. The court remanded this issue because the ITC did not properly show that it even considered any discrepancies in its questionnaire responses. Nucor points specifically to the fact that Producer A submitted a response that contained conflicting answers. In its remand results, the ITC addressed Producer A's original response, explaining that it was completed prior to Producer A's officials having read the directions or conferred with one another. Moreover, having noted the inconsistencies in Producer A's response, the ITC requested that Producer A submit an amended questionnaire response with revised answers to several questions containing numerical data. Because the ITC has demonstrated that it did indeed consider discrepancies in Producer A's original questionnaire response, the ITC has adequately addressed the court's remand instructions. There is no need for any further investigation on this issue. The court therefore sustains the ITC's redetermination on remand that Producer A was properly included in its import data as a domestic producer of CSSF.

## CONCLUSION AND ORDER

Upon consideration of the remand redetermination filed by the ITC, the comments filed by Plaintiff and the Defendant-Intervenors, the reply filed by the Defendant, all other pertinent papers, and oral argument, it is hereby

ORDERED that the ITC's remand redetermination is SUSTAINED; it is further

ORDERED that judgment is entered for the United States.

                                                                    /s/ Richard W. Goldberg
                                                                    Richard W. Goldberg
                                                                    United States Judge

Dated: May 24, 2013

New York, N.Y.